**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR
(RETIRED, SITTING BY SUPR. CT. ORDER 1,
2025 (JANUARY 8, 2025))

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: December 19, 2024
Date Decided: January 17, 2025

Steven L. Caponi, Esquire
Matthew B. Goeller, Esquire
K&L GATES LLP
600 King Street, Suite 901
Wilmington, DE 19801

Rudolf Koch, Esquire
John M. O'Toole, Esquire
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Re:    *Valhalla Partners II, L.P., et. al. v. Vistar Media, Inc.*, C.A. No.
2019-0202-SG

Dear Counsel:

In the last iteration of this matter, I issued a post-trial decision, my Memorandum Opinion of December 9, 2024[1] (the "Memorandum Opinion"), finding that the contract among the parties called for the repayment of the notes in question in cash, and not in conversion to equity, under the facts as demonstrated at trial. Having thus disposed of Plaintiffs' contract claims, I reserved decision on whether equity offered relief in light of Defendant's actions and statements after the parties contracted for the notes.[2] The following brief decision addresses those issues, and finds that no relief in equity is invoked.

---

[1] *Valhalla P'rs II, L.P. v. Vistar Media, Inc.*, 2024 WL 5039563 (Del. Ch. Dec. 9, 2024).

[2] Plaintiffs also, less plausibly, seek relief under the rubric of estoppel for statements contemporary with the issuance of the notes.

To briefly recapitulate the facts, Defendant Vistar Media, Inc. ("Vistar") issued a series of convertible promissory notes to Plaintiffs in 2012 and 2013 (the "Second Round Notes").[3]  When Vistar sought to repay the Second Round Notes after maturity, Plaintiffs averred that Vistar could not do so, and that Plaintiffs instead had the right to continue to hold the Second Round Notes until an event that converted the Second Round Notes to equity occurred.[4]  In the Memorandum Opinion, I found, as a matter of contract, that language in the Second Round Notes provided noteholders with the right to repayment at maturity, but not the unilateral right to extend maturity.[5]  I also rejected Plaintiffs' claims, based on the implied covenant of good faith and fair dealing and on reformation, to otherwise impose this unilateral right of extension.[6]  At the same time, I denied Vistar's counterclaims, in particular that Plaintiffs had a contractual obligation to *accept* repayment (which Vistar had argued was breached when Plaintiffs refused to accept repayment and instead litigate here).[7]  However, I reserved on Plaintiffs' claims based on promissory estoppel and equitable estoppel.[8]  The parties conferred and Plaintiffs' counsel, by a December 19, 2024 letter, informed me that, as between themselves, the parties did not believe further proceedings on the estoppel claims were

---

[3] *Valhalla P'rs II, L.P.*, 2024 WL 5039563, at *10.
[4] *Id.* at *13.
[5] *Id.* at *19.
[6] *Id.* at *20–21.
[7] *Id.* at *21.
[8] *Id.*

warranted.[9]  I resolve the estoppel claims in this Letter Opinion, adopting all the facts found in the Memorandum Opinion.

Vistar was founded in 2012.[10]  At the time, as a start-up focused on advertising technology, it sought out funding from venture capitalists and angel investors.[11] After raising funds by issuing convertible promissory notes in early 2012,[12] Vistar issued the Second Round Notes, including to Plaintiffs, on or around December 31, 2012, March 1, 2013, June 1, 2013, and September 1, 2013.[13]  The Second Round Notes had a maturity date of September 30, 2014, with a nominal interest rate of 4%.[14]  Plaintiffs, as venture capitalists and angel investors, purchased the Second Round Notes in the hopes that Vistar would be successful and conduct an equity financing[15] (the latter of which would trigger either optional or automatic conversion of the Second Round Notes to equity of Vistar).[16]  Plaintiffs were not primarily interested in earning the nominal interest.[17]  Vistar was aware that Plaintiffs' goal

---

[9] Ltr. to V.C. Glasscock from Steven L. Caponi regarding the Mem. Op. dated Dec. 9, 2024, Dkt. No. 304.
[10] *Valhalla P'rs II, L.P.*, 2024 WL 5039563, at *4.
[11] *Id.* at *4, *6.
[12] *Id.* at *4–5.
[13] *Id.* at *10.
[14] *Id.* at *8, *11.
[15] *Id.* at *6.
[16] *Id.* at *9–10.
[17] *Id.* at *6.

was to hold equity in successful start-ups.[18]  The Second Round Notes did not contain any express obligation to pursue or consummate an equity financing.[19]

No evidence was presented that during the negotiation of the Second Round Notes Vistar promised or represented to any Plaintiff that their Second Round Note would convert to equity, outside of the possibility of conversion precedent on equity financing.  In other words, the terms of the Second Round Notes, as executed by Plaintiffs and drafted by Plaintiff Valhalla Partners II, L.P. ("Valhalla"), provided that conversion to equity was predicated on an equity financing, which may or may not occur.[20]  Upon maturity, Plaintiffs were entitled to repayment with interest.[21]  In the course of negotiating and issuing the Second Round Notes, Vistar did share financial statements with Plaintiff Advancit Capital I, LP ("Advancit"), which statements recorded the Second Round Notes as the "Purchase of Stock."[22] Throughout the life of the Second Round Notes, Vistar consistently accounted for the Second Round Notes as the "Purchase of Stock" on its financial statements, which it shared with certain Plaintiffs who used them for their own accounting and financial reasons (and shared capitalization tables of Vistar on a fully diluted basis that showed Second Round Note holders as equity holders).[23]  Vistar did make

---

[18] *Id.*
[19] *Id.* at *20.
[20] *Id.* at *10.
[21] *Id.* at *9, *19.
[22] *Id.* at *12 n.121 (Vistar shared these financial statements with Advancit on January 29, 2013).
[23] *Id.*

statements to third-parties prior to maturity that the Second Round Notes were "basically an equity instrument," were "intended to convert," and "will almost 100% convert."[24]

The Second Round Notes did not contain any express provision regarding extending maturity[25] and I found in the Memorandum Opinion that ambiguous language in the Second Round Notes did not provide holders of Second Round Notes with the right to unilaterally extend maturity.[26] Instead, extension of the maturity date was possible in accord with the explicit amendment provision of the Second Round Notes, which required approval by Vistar *and* at least a majority of the aggregate amount of the outstanding principal of the Second Round Notes.[27] This amendment procedure was used to amend the maturity date twice, first extending it from September 31, 2014 to September 30, 2015 (the "First Extension"), and finally extending it from September 30, 2015 to March 31, 2016 (the "Second Extension").[28] If a "qualified" financing had occurred during the extension periods, the notes would have converted to equity.[29]

---

[24] *Id.* at *12 n.116.
[25] *Id.* at *11.
[26] *Id.* at *19.
[27] *Id.* at *11.
[28] *Id.*
[29] *See id.* at *10 (quoting the Second Round Note term that provided for automatic conversion to equity in the case of a "Qualified Financing"). Noteholders would have the option to convert their notes to equity if the equity financing generated cash proceeds of less than $2 million. *Id.* at *1 n.8, *10.

In its October 2, 2014 email requesting approval of the First Extension from certain noteholders, Vistar wrote that as a result of "exceeding its projections . . . [it had] not needed to raise a qualifying financing" and, therefore, Vistar "needs to extend the maturity of the note by 12 months."[30]

In its June 28, 2015 email requesting approval of the Second Extension from certain noteholders, Vistar again raised its success and being ahead of budget as reasons that it "[does] not see the need for another funding round before September of [2015] when the convertible note is set to mature" and therefore "would like to request an extension until March of 2016."[31]  Absent these extensions, according to the terms of the Second Round Notes as I have found them, Vistar would have been then liable for the repayment of the Second Round Notes together with interest.

During March 2016, but prior to the final maturity date of March 31, 2016, Plaintiff Great Oaks Venture Fund LP ("Great Oaks") inquired about the status of the Second Round Notes, to which, Vistar responded that Great Oaks' Second Round Note "is still outstanding and has not been converted" and that "[Vistar] need[s] to ask for approval from note holders again for extension."[32]  Great Oaks also asked why its Second Round Note would not convert to Vistar preferred equity if Vistar's

[30] *Id.* at *11.
[31] *Id.*
[32] *Id.*

business was so robust, to which Vistar responded that such a conversion required an equity financing.[33]

Vistar did not seek a third extension (nor was any evidence presented that any Plaintiff requested one), and continued to communicate with Plaintiffs following the final maturity date of the Second Round Notes of March 31, 2016.[34] Vistar and Great Oaks continued their email exchange, including on May 10, 2016, when Vistar wrote to Great Oaks that Vistar expected an equity financing "over the next 6 months."[35] In October 2016, Vistar wrote to Great Oaks that it had "[n]o need for fresh capital at the moment but going to speak with [its] lawyers about note cleanup ideas in Q4."[36] On June 8 and 9, 2016, Vistar and Valhalla exchanged emails discussing various valuations for Vistar.[37] On October 13, 2016, Vistar told Plaintiff Scott Becker that the Second Round Notes were "still outstanding" and it is "hard to say what [the] estimated current value is."[38]

Around late 2016, Vistar had internal discussions related to repaying the Second Round Notes and by a February 17, 2017 unanimous written consent of Vistar's board of directors, Vistar resolved to repay the Second Round Notes and to

---

[33] *Id.*
[34] *Id.* at *12–13.
[35] *Id.* at *12.
[36] *Id.*
[37] *Id.* at *13.
[38] *Id.*

7

repurchase Vistar common stock.[39] As part of Vistar's tender offer, Becker and Great Oaks (who both held Vistar common stock) received Vistar financial statements, which did not include the Second Round Notes as liabilities.[40] Vistar again referred to Becker's Second Round Note as "still outstanding" in communication with Becker related to the tender offer.[41]

Advancit also recalled a conversation with Vistar on March 14, 2017, where Vistar had "made the joke, [Vistar] better be [Advancit's] fund-returner," which Advancit took to mean that "the return on [its] investment would return the whole size of [Advancit's] fund."[42] Two days later, on March 16, 2017, Vistar notified holders of Second Round Notes that it intended to repay the Second Round Notes in full, in cash, on March 30, 2017.[43] Plaintiffs rejected Vistar's repayment.[44] This litigation ensued.

Plaintiffs argue that, prior to repayment, the foregoing statements and representations made by Vistar (and their conduct therewith) conveyed to Plaintiffs that an equity financing that would convert the Second Round Notes was imminent. Plaintiffs, they say, relied on these words and actions, and otherwise may not have approved either of the two extensions to maturity, or may have requested a third

---

[39] *Id.*
[40] *Id.* at *13 n.127.
[41] *Id.*
[42] *Id.* at *13 n.128.
[43] *Id.* at *13.
[44] *Id.*

8

extension to maturity. The detriment to Plaintiffs, presumably, being the retention of their capital by Vistar, when Plaintiffs could have demanded repayment in cash and deployed it more profitably elsewhere (or, presumably, in the case of statements made in connection with the Second Round Note purchase/sale, not have invested at all). Accordingly, Plaintiffs posit that promissory estoppel or equitable estoppel should apply.

Promissory estoppel requires that:

(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[45]

These elements must be proven by clear and convincing evidence.[46] Promissory estoppel requires "a real promise, not just mere expressions of expectation, opinion, or assumption."[47] Such a promise must be "reasonably definite and certain."[48]

The promise that Plaintiffs argue was made is that the Second Round Notes would convert or would soon convert to Vistar equity, rather than being repaid in cash. As an initial matter, I reject that such a promise was made at the time the

---

[45] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000). Because of my decision here, I need not evaluate whether the express contract language of the Second Round Notes precludes the relief Plaintiffs seek via estoppel or equitable estoppel, as a matter of law.

[46] *Schaeffer v. Lockwood*, 2021 WL 5579050, at *18 (Del. Ch. Nov. 30, 2021).

[47] *Id.* (quoting *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009)).

[48] *Id.*

Second Round Notes were issued (such that Plaintiffs could rely on such promise when deciding whether to invest). Plaintiffs are venture capitalists and angel investors who invest in start-ups expecting many of their investments to fail (which, as they explained, is why they wish to hold equity when their investments are successful).[49] They purchased notes that rejected automatic conversion and that were payable in cash at maturity.[50] Furthermore, Plaintiffs do not point to any statements made by Vistar which would contradict that reading of the notes, except that Advancit was provided with financial statements that recorded the Second Round Notes as "Purchase of Stock," which Plaintiffs purport equates to a promise to provide equity. I do not find it reasonable for Advancit, which executed a Second Round Note with express and conditional conversion provisions, to otherwise expect that its Second Round Note would in all cases convert to equity based on the accounting treatment of such convertible promissory note.

I pause here to further address these financial statements, which were provided to Plaintiffs throughout the life of the Second Round Notes. Plaintiffs' claim the accounting treatment of the Second Round Notes as equity in Vistar's financial statements (and which Plaintiffs were provided with or obtained for their own

---

[49] *Valhalla P'rs II, L.P.*, 2024 WL 5039563 at *6.

[50] Valhalla explicitly negotiated that the Second Round Notes would not automatically convert to equity at maturity. *Id.* at *8. In other words, even if Vistar succeeded and did not fail, as Plaintiffs expected many of their investments to, conversion was expressly subject to the occurrence of equity financing in the Second Round Notes executed by the Plaintiffs. *Id.* at *10 (providing the conversion provisions of the Second Round Notes).

financial and accounting reasons) equated to a promise that the Second Round Notes must eventually convert to equity. As with the financial statements provided to Advancit prior to it being issued a Second Round Note, I find this "promise" to be belied by the Second Round Notes. I do not find in the face of the written agreements (signed by and available to the Plaintiffs) that it was reasonable for the Plaintiffs to rely on the accounting treatment of the Second Round Notes so that equity must impose a contractual term absent from the notes themselves. Plaintiffs have also pointed to certain statements Vistar made to third parties about the Second Round Notes (and their intended conversion, e.g., the Second Round Notes were "basically an equity instrument") as evidence of a promise of conversion. However, these statements were made to third parties, and Plaintiffs have not argued that the same statements were made to Plaintiffs or that Plaintiffs were otherwise aware of the statements at the relevant times (much less that Vistar as a promisor expected, reasonably or otherwise, to induce action or forbearance on the part of Plaintiffs as promisees through these statements); I, therefore, do not consider these statements for purposes of evaluating promissory estoppel.

In other words, there is no basis for equity to impose a modification to the contractual language of the Second Round Notes based on any Vistar promise before or contemporaneous with purchase of the Second Round Notes.

I next turn to the pre-maturity actions and representations of Vistar. There were two decisions taken by Plaintiffs to which an estoppel could theoretically attach: the decisions to extend the maturity dates of the Second Round Notes. At the time the First Extension and Second Extension were made, Vistar reached out to noteholders (or at least enough noteholders to reach the required aggregate majority of the outstanding principal for an amendment) and told them that Vistar was successful and ahead of budget, and therefore did not need to raise additional funding. In the case of the First Extension, Vistar said it therefore "needs to extend the maturity," and in the case of the Second Extension, it said it "would like to request an extension." Plaintiffs see, implicit in these statements of Vistar's success (which were also conveyed in general updates from Vistar and in individual status updates) and the lack of need for additional financing, a promise that equity financing—resulting in conversion—was forthcoming. This, Plaintiffs argue, induced them to sign the two extensions. In other words, Vistar's "needing" or "wanting" an extension was a promise that, if the maturity date was so extended, an equity financing (and resulting conversion) would occur.

Plaintiffs ask that I look to *Keating v. Board of Education of Appoquinimink School District*,[51] where a teacher was repeatedly and definitively told by the

---

[51] 1993 WL 460527 (Del. Ch. Nov. 3, 1993), *aff'd by*, *Bd. of Educ. of Appoquinimink Sch. Dist. v. Keating*, 650 A.2d 1305 (Del. 1994).

principal of the school where she worked that she would be rehired, a decision that was typically rubber stamped by the board of education of the relevant school district if a teacher was recommended by an administrator.[52] In reliance on these representations, the teacher bought a car (upon the principal's advice) and did not seek another teaching position, only for the board of education to vote not to rehire her.[53] The court found it was reasonable for the teacher to rely on the representations made to her that she would be rehired even if she knew the decision to rehire her was ultimately up to the board of education because that board had never rejected an administrator's hiring recommendation.[54] I do not find the circumstances in *Keating* to be similar to those here, or persuasive in this context.

First, Vistar's requests for extensions, looked at in the context of the contractual language, may reasonably be read as requesting the extension periods to avoid the responsibility to repay the Second Round Notes in cash at maturity, *absent* an extension. Plaintiffs suggest that they read this as a promise that an equity financing must occur, but Vistar did not state that an equity financing would occur during the extension period it was requesting. While such a definitive statement would not necessarily be required to create a promise here, Plaintiffs need to point to something other than Vistar's statements regarding its success and the resulting

---

[52] *Id.* at *5.
[53] *Id.*
[54] *Id.* at *6.

lack of a need for equity financing. That such success indicated to Plaintiffs that Vistar *could* achieve an equity financing, to my mind, does not equate to a promise from Vistar that it *would* complete an equity financing.

Additionally, even if I were to find an implied promise in the requests for extension, such a promise is a far cry from the explicit representations in *Keating*, and I do not find it would be reasonable to rely on such an implied promise. Vistar was, at the times it was requesting extensions, successful. However, Vistar itself stated when requesting the extensions that its success was the very reason it had *not* conducted equity financing. It follows (as it did with the Second Extension) that Vistar's continued success could continue to delay equity financing.

Finally, I do not see an injustice that demands a remedy based on these facts. The amendment procedure agreed to here required consent of both Vistar and a majority of the outstanding principal of the Second Round Notes. Under the contractual language as I have construed it, both extensions had benefits to issuer and holder. Vistar benefitted by avoiding an immediate obligation to make a cash repayment. The holders benefited by continuing to have a possibility of a conversion. That an equity financing would not occur, even with the extensions, was a business risk. Plaintiffs approved both extensions, and with the benefit of hindsight they now seek to have those decisions retracted. This result would not give Plaintiffs the relief they seek, however—at most, even if an estoppel resulted,

14

Defendant would be estopped from relying on the extensions, and Plaintiffs' damages would be limited to the return on capital they could have expected, if the notes had been repaid on the (non-extended) maturity date.[55] Plaintiffs, instead, seek a finding that the notes remained viable until converted to equity. The doctrine of promissory estoppel does not support such a result.

Lastly, I address Vistar's statements and actions during the post-maturity period. Plaintiffs point to the statements made by Vistar (1) to Becker and Great Oaks via financial statements that Plaintiffs claim did not include the Second Round Notes as liabilities to be repaid, despite the Vistar board of directors having resolved to repay the Second Round Notes, (2) to Valhalla, when discussing possible valuations of Vistar, (3) to Great Oaks on May 10, 2016 that it expected equity financing over the following 6 months, (4) to Becker that his Second Round Notes were still outstanding, and (5) to Advancit that Vistar should be Advancit's "fund-returner." The "promise," again, per Plaintiffs is that an equity financing event that would convert the Second Round Notes was still forthcoming. I note that these statements were made to only certain of the Plaintiffs. In other words, that Vistar told Great Oaks that it expected an equity financing event, does not accrue to the other Plaintiffs who were not so informed. In any case, to the extent promises exist, I do not find it reasonable for the Plaintiffs to which they were made to have relied

---

[55] Plaintiffs, I note, have not sought such relief, or attempted to prove damages.

15

on them, to the extent there existed any such reliance. No Plaintiff, it seems, raised any issue with the passing of the maturity date, and even if requested by Plaintiffs, a third extension was not possible without Vistar's approval. In other words, it is unclear to me what reliance to its detriment, post maturity, any Plaintiff made. Vistar's statements indeed held out the hope of equity financing, but to the extent Plaintiffs relied on them, it was only in briefly postponing exercising their present right to repayment; equity cannot support the relief (conversion to equity) that Plaintiffs now seek.

Having not found any promises (and even when assuming such promises, having not found reliance on such assumed promises to be reasonable) at the time the Second Round Notes were issued, extended (either the First Extension of Second Extension), or post-maturity, I do not find grounds for promissory estoppel. I turn next to equitable estoppel (which does not require a promise). Equitable estoppel requires a demonstration by Plaintiffs that:

> (i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance.[56]

---

[56] *Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, 2019 WL 1223026, at *23 (Del. Ch. Mar. 14, 2019) (quoting *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005)). The Plaintiff has the burden of establishing these elements by clear and convincing evidence. *Id.*

16

It is hard to imagine that counterparties to the contracts "lacked the means of obtaining knowledge of the . . . facts in question" when those facts were available by reading the terms of the Second Round Notes. Further, while equitable estoppel does not require a promise, it still requires reasonable reliance on the conduct of the party to be estopped. Plaintiffs point to the same statements and actions they claim to be promises as the conduct for the basis equitable estoppel. In my analysis of the promissory estoppel claim, even where I assumed for purposes of analysis the existence of a promise, I found reliance on such promises not to be reasonable. For those same reasons, I do not find it reasonable for Plaintiffs to have relied on the conduct of Vistar they question. The Second Round Notes were available to the Plaintiffs to determine what rights they had regarding conversion and extension of maturity; in Valhalla's case it had drafted the language in question—certain of the other Plaintiffs could not recall if they had read the Second Round Notes,[57] others asked for conversion without an equity financing (for which the Second Round Notes did not provide).[58] As stated above, this was not a case where Vistar told Plaintiffs that an equity financing would occur within the extended maturity date (something that it would be uniquely placed to know), but only that it expected one

---

[57] *Valhalla Partners II, L.P.*, 2024 WL 5039563 at *18.

[58] *Id.* at *11 (Plaintiffs DFJ Mercury II, L.P. and DFJ Mercury Affiliates Fund, L.P., and Great Oaks asked Vistar why Vistar would not convert the Second Round and were told by Vistar that conversion required an equity financing).

17

to occur.  Equity, I find, is not invoked here.  If it were, again, presumably any relief would be limited to returns forgone by not extending, and instead taking cash at maturity.  Equity could not support the relief sought—construing the Second Round Notes so as to provide a right to hold until an equity financing occurred.

To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III